04-6665-pr
Rodriguez v. Miller

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

--------

August Term, 2006

(Argued:  November 2, 2005;     Last Submission: April 3, 2007
Decided: August 29, 2007              Amended: August 6, 2008)

Docket No. 04-6665-pr

------------------------------------------------------------X

JOSE RODRIGUEZ,

                    Petitioner-Appellant,

          - v. -

DAVID MILLER, Superintendent, Eastern Correctional Facility,

                    Respondent-Appellee.

------------------------------------------------------------X

Before: CARDAMONE, McLAUGHLIN, and B.D. PARKER, Circuit Judges.

     Petitioner appeals from the denial of a writ of habeas corpus by the United States District Court for the Eastern District of New York (Block, J.).

     AFFIRMED.

                         KATHERYNE M. MARTONE, Legal Aid
                         Society, Criminal Appeals Bureau,
                         New York, N.Y. (Mitchell J.
                         Briskey, on the brief) for
                         Petitioner-Appellant.

VICTOR BARALL, Assistant District Attorney, for Charles J. Hynes, District Attorney, Kings County, Brooklyn, N.Y. (Leonard Joblove, on the brief) for Respondent-Appellee.

McLAUGHLIN, Circuit Judge:

The Supreme Court has vacated our decision in this habeas proceeding with the instruction to reconsider it in light of Carey v. Musladin, 127 S. Ct. 649 (2006).

Relying on our own well-settled precedent and what we conceived to be the teachings of the high court, we had held that the New York State Courts had unreasonably applied "clearly established" Sixth Amendment law in excluding Jose Rodriguez's family from his criminal trial. Accordingly, we remanded the case to the United States District Court for the Eastern District of New York (Block, J.) with instructions to grant Rodriguez's petition. See Rodriguez v. Miller, 439 F.3d 68, 76 (2d Cir. 2006).

Our decision cannot stand after Musladin. Thus, we are now obliged to conclude that Rodriguez's petition must be denied and the district court affirmed.

## BACKGROUND

A full recitation of the salient history of this suit may be found in our prior opinion. See Rodriguez, 439 F.3d at 70-73. We revisit only the facts controlling our decision today.

A. Rodriquez

In 1995, Rodriguez was tried in Kings County for selling cocaine to an undercover officer (the "Undercover") in the Bushwick area of Brooklyn. The State moved to close the courtroom during the Undercover's testimony to protect his identity. The state court held a hearing pursuant to People v. Hinton, 31 N.Y.2d 71, 334 N.Y.S.2d 885, 286 N.E.2d 265 (1972), at which the Undercover testified that he: (1) had received numerous threats in the course of prior work in Bushwick; (2) planned to return to Bushwick to conduct additional investigations "in the near future"; (3) had never in his life testified in open court; and (4) feared Rodriguez's relatives would recognize him and spread the word that he was a police officer. He also admitted that he did not know any of Rodriguez's relatives and had not been threatened by them.

The state court found that this testimony was sufficient to close the courtroom. Rodriguez, himself, conceded that some closure was necessary but argued that the court could not exclude his family on these facts alone. The court eventually ruled that it would permit Rodriguez's mother and brother to attend the proceedings but only if they sat behind a screen to obscure the Undercover's appearance. Fearing prejudice to his defense, Rodriguez objected to the screen and instructed his family not to attend his trial.

3

Rodriguez was convicted. The Appellate Division affirmed his conviction despite his claim that the courtroom closure violated his right to a public trial. See People v. Rodriguez, 258 A.D.2d 483, 685 N.Y.S.2d 252 (2d Dep't 1999). The New York Court of Appeals denied leave to appeal. See People v. Rodriguez, 93 N.Y.2d 978, 695 N.Y.S.2d 64, 716 N.E.2d 1109 (1999).

In June 2000, Rodriguez petitioned the United States District Court for the Eastern District of New York for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, again arguing the lack of a public trial. The district court denied the petition, holding that the state court's decision was reasonable under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Rodriguez v. Miller, No. 00-cv-3832, 2001 WL 1301732, at *5 (E.D.N.Y. Oct. 22, 2001).

In November 2003, we vacated and remanded for reconsideration in light of our then-recent opinion in Yung v. Walker, 341 F.3d 104 (2d Cir. 2003) (interpreting Supreme Court precedent to bar exclusion of family unless "exclusion of that particular relative is necessary to protect the overriding interest at stake" (emphasis added)). See Rodriguez v. Miller, 82 F.App'x 715, 716 (2d Cir. 2003). On remand, the district court again denied the petition, concluding that Rodriguez's mother and brother were properly excluded because they lived near

4

the Undercover's territory.  See Rodriguez v. Miller, No. 00-cv-3832, 2004 WL 3567978, at *6 (E.D.N.Y. Nov. 24, 2004) (mother lived in Bushwick, brother in nearby Ridgewood).

In February 2006, we again vacated the district court's judgment.  While conceding that the state court may have made findings that justified "barring the attendance of the general public," we concluded that the state court had failed to make the "particularized inquiry" necessary to exclude Rodriguez's family members.  Rodriguez v. Miller, 439 F.3d 68, 74 (2d Cir. 2006).  In particular, we questioned the district court's reliance—without more—on the geographical proximity of the Undercover's territory and the residences of Rodriguez's family members to support the courtroom closure.  See id. at 74-75.  We relied on a host of decisions of our own Court to support our conclusion that "exclusion of family members requires stricter scrutiny than exclusion of the public."  Id. at 76.

In January 2007, the Supreme Court granted certiorari and vacated our decision for further consideration in light of its recent decision in Carey v. Musladin, 127 S. Ct. 649 (2006).

B.    Musladin

In Musladin, a habeas petitioner convicted of murder in California state court claimed that he had been denied his right to a fair trial because his victim's family had been permitted to wear buttons bearing a photograph of the victim in the courtroom

gallery throughout the proceedings.  The district court denied habeas relief but granted a certificate of appealability.

The Ninth Circuit reversed.  See Musladin v. Lamarque, 427 F.3d 653 (9th Cir. 2005).  The court concluded that the state court's test for the "inherent prejudice" caused by the inflammatory buttons "was contrary to clearly established federal law and constituted an unreasonable application of that law" under AEDPA.  Id. at 659-60.

The Ninth Circuit first noted that the appropriate "inherent prejudice" test is derived from the Supreme Court's watershed decisions in Estelle v. Williams, 425 U.S. 501 (1976), and Holbrook v. Flynn, 475 U.S. 560 (1986).  Id. at 656-57.  The court went on to observe, however, that its own decision in Norris v. Risley, 918 F.2d 828 (9th Cir. 1990), "has persuasive value in an assessment of the meaning of the federal law that was clearly-established by Williams and Flynn."  Musladin, 427 F.3d at 657.

Grafting its own Norris decision onto the Supreme Court's jurisprudence proved critical to the Ninth Circuit's analysis, as Norris dealt with prejudicial conduct by private courtroom spectators, as opposed to the state-sponsored conduct at issue in the Supreme Court's decisions.  Compare Norris, 918 F.2d at 829-31 ("Women Against Rape" buttons on private spectators in gallery), with Williams, 425 U.S. at 502 (court compelled

6

defendant to wear prison clothes at trial), and Flynn, 475 U.S. at 562 (state troopers sat behind defendant at trial). Given the "striking factual similarities" between the victim buttons in Musladin and the anti-rape buttons found inherently prejudicial in Norris, the Ninth Circuit had little trouble finding that the California courts had violated "clearly established federal law" by not ordering the spectators to remove the buttons. Musladin, 427 F.3d at 658, 661.

In December 2006, the Supreme Court vacated the Ninth Circuit's decision. See Musladin, 127 S. Ct. at 654. The Supreme Court first reiterated the bedrock principle of habeas law in the AEDPA universe: "[C]learly established Federal law . . . refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." Id. at 653 (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)). It then noted that, in contrast to warring decisions among the federal circuits, "the effect on a defendant's fair-trial rights" of "spectator conduct . . . is an open question in our jurisprudence." Id. at 653-54 (emphasis added) (comparing Billings v. Polk, 441 F.3d 238, 246-47 (4th Cir. 2006) (no violation of right to a fair trial based on spectator's clothing), with Norris but noting no Supreme Court decision on the issue).

In so doing, the Court gave a narrow reading to its holdings

in <u>Williams</u> and <u>Flynn</u>—essentially concluding that the two cases provided a rule for assessing only the prejudice of "state-sponsored courtroom practices." <u>Id.</u> at 653.[1]  Thus, the Court concluded that "[n]o holding of this Court required the California Court of Appeal to apply the test of <u>Williams</u> and <u>Flynn</u> to the spectators' conduct" at issue in <u>Musladin</u> and thus held that the state court's decision was not "contrary to or an unreasonable application of clearly established federal law." <u>Id.</u> at 654.

Rodriguez's petition now returns to us for reconsideration in light of the teachings of <u>Musladin</u>.

<strong>DISCUSSION</strong>

As the parties agree, the sole issue confronting this Court on remand is whether the New York State Courts' decision to exclude Rodriguez's family from his trial involved an "unreasonable application of . . . clearly established Federal

---

[1] At first blush, little in <u>Williams</u> and <u>Flynn</u> indicates that the Court intended to limit its holding to state-sponsored conduct cases.  The Court buttressed its narrow interpretation in <u>Musladin</u> by noting that "part of the legal test of <u>Williams</u> and <u>Flynn</u> . . . ask[s] whether the practices furthered an essential <u>state</u> interest." <u>Musladin</u>, 127 S. Ct. at 654.  Nevertheless, at least one Justice noted that <u>Williams</u> and <u>Flynn</u> are merely part of the Court's larger jurisprudence on the fundamental fairness of criminal trials. <u>See</u> <u>id.</u> at 657 (Souter, <u>J.</u>, concurring) (disagreeing with the majority's reading and arguing that "[t]he Court's intent to adopt a standard at [a] general and comprehensive level" on the fundamental fairness of the trial process in <u>Flynn</u> and <u>Williams</u> "could not be much clearer").

8

law." 28 U.S.C. § 2254(d)(1).[2]  We conclude that it did not.

A.  <u>Clearly established federal law</u>

"Clearly established federal law" refers only to the holdings of the Supreme Court. <u>Williams v. Taylor</u>, 529 U.S. at 412.  No principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief. <u>See</u> <u>Musladin</u>, 127 S. Ct. at 653, 654.  Leading by example, <u>Musladin</u> admonishes courts to read the Supreme Court's holdings narrowly and to disregard dicta for habeas purposes.[3]  Happily, this case

_____

[2] Rodriguez no longer appears to argue that the state courts' decision to exclude his family was also directly "contrary to" clearly established federal law. <u>See</u> 28 U.S.C. § 2254(d)(1).  To the extent he does, we note that the New York courts neither "arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law" nor "decide[d] a case differently than [the Supreme] Court . . . on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362 at 413.  Also, to the extent that Rodriguez still argues that it was error for the district court to consider new evidence in support of the courtroom closure after our prior remand in this case, Rodriguez fails both prongs of the test in <u>Nieblas v. Smith</u>, 204 F.3d 29, 32 (2d Cir. 1999).

[3] It is not clear whether courts should treat the underpinnings of Supreme Court decisions so cavalierly <u>outside</u> the AEDPA context.  Individual Justices have cautioned against such a restrictive (and perhaps constrictive) reading of precedent, both in <u>Musladin</u>, <u>see, e.g.,</u> 127 S. Ct. at 655 (Stevens, <u>J.</u>, concurring) ("It is quite wrong to invite state court judges to discount the importance of [our] guidance on the ground that it may not have been strictly necessary as an explanation of the Court's specific holding in the case."), and before, <u>see, e.g.,</u> <u>County of Allegheny v. ACLU, Greater Pittsburgh Chapter</u>, 492 U.S. 573, 668 (1989) (Kennedy, <u>J.</u>, concurring in part and dissenting in part) ("[T]he principle of <u>stare decisis</u> directs us to adhere not only to the holdings of our prior cases, but also their

does not present the related question of whether and under what circumstances clearly established federal law exists when there may be a potential conflict among Supreme Court decisions. See, e.g., Abdul-Kabir v. Quarterman, 127 S. Ct. 1654, 1664, 1670 n.17 (2007) (noting possible conflict in sentencing law); Brewer v. Quarterman, 127 S. Ct. 1706, 1714 (2007) (Roberts, C.J., dissenting) (same).[4]

Unsurprisingly, the parties here have broken lances over the scope and sources of "clearly established federal law" on courtroom closures. The State insists that there are only two relevant authorities: the holdings of the Supreme Court in In re Oliver, 333 U.S. 257 (1948), and Waller v. Georgia, 467 U.S. 39 (1984). Rodriguez, for his part, champions a tradition of courtroom closure cases bookended by Oliver and Waller, particularly Globe Newspaper Co. v. Superior Court for the County of Norfolk, 457 U.S. 596 (1982), and Press-Enterprise Co. v. Superior Court of California, Riverside County, 464 U.S. 501

explications of the governing rules of law."). AEDPA deference raises the stakes on Judge Friendly's famous warning that "[a] judge's power to bind is limited to the issue that is before him; he cannot transmute dictum into decision by waving a wand and uttering the word 'hold.'" United States v. Rubin, 609 F.2d 51, 69 n.2 (2d Cir. 1979) (Friendly, J., concurring).

[4] Rodriguez reads Abdul-Kabir and Brewer to intimate that clearly established federal law comprises "all the governing legal principles and supporting reasoning contained in the Supreme Court's decisions." Such a broad interpretation warps the logic of those cases and would bring them into a direct conflict with Musladin, decided only six months earlier.

10

(1984).  In addition, Rodriguez argues that we should still apply our own precedents to "interpret" Waller and grant his writ.  We consider each potential authority in turn.

1.    In re Oliver

In Oliver, the Supreme Court overturned a contemner's conviction pursuant to an antiquated "one-man grand jury" procedure on Sixth Amendment grounds because the Michigan trial court had excluded the entire general public "except the judge and his attaches."  333 U.S. at 271.  The Court neither sketched a test for courtroom closures nor provided contours for the constitutional right.  At most, the Court held that a defendant's right to a public trial was violated by the wholesale and unjustified exclusion of the public from an inquisitorial "secret" trial.  See id. at 259, 278.

The Oliver Court did note that "without exception all courts have held that an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged."  Id. at 271-72.  However, we have already confirmed that this sentiment is dicta.  See Yung v. Walker, 341 F.3d 104, 110 (2d Cir. 2003).  Thus, it cannot constitute clearly established federal law under AEDPA.

2.    Globe Newspaper and Press-Enterprise

Globe Newspaper and Press-Enterprise employed First Amendment balancing to create an embryonic version of the

11

courtroom closure test that eventually reached its full expression in Waller. Indeed, Waller expressly incorporates these First Amendment standards into its rule. See 467 U.S. at 47 ("[W]e hold that under the Sixth Amendment any closure of a suppression hearing over the objections of the accused must meet the tests set out in Press-Enterprise and its predecessors.").

In Globe Newspaper, the Court held that to justify the exclusion of the press from criminal trials, the state must: (1) show a compelling government interest; and (2) narrowly tailor the courtroom closure to serve that interest. 457 U.S. at 606-07. In Press-Enterprise, the Court added that there was a presumption of openness in criminal trials that could only be rebutted by "findings specific enough that a reviewing court can determine whether the closure order was properly entered." 464 U.S. at 510.

To the extent that the general approach of Globe Newspaper or Press-Enterprise might aid Rodriguez, Waller has incorporated it and now stands as the new touchstone of case law on public trials. Rodriguez clearly does not fall within the narrow holdings of these freedom of the press cases. Neither Globe Newspaper nor Press-Enterprise held that the exclusion of the family and friends of the defendant should be subject to a heightened level of scrutiny. At best, Globe Newspaper simply repeated Oliver's dicta. See Globe Newspaper Co., 457 U.S. at

12

605.  Thus, the two cases are irrelevant to Rodriguez for AEDPA purposes.

    3.    Waller

Waller provides the ne plus ultra of the Sixth Amendment right to a public trial: a four-part closure test.  To close a proceeding: (1) the party seeking closure must advance an "overriding interest that is likely to be prejudiced"; (2) the closure must be "no broader than necessary to protect that interest"; (3) the court must consider "reasonable alternatives" to closure; and (4) the court must "make findings adequate to support the closure."  Waller, 467 U.S. at 48.

We do not believe—nor does the State truly argue—that the Waller test should be limited solely to the closure of suppression hearings.  Waller expressly relied upon and incorporated decisions addressing closures in a variety of proceedings.  See id. at 44-48 (citing Oliver, 333 U.S. at 259 (one-man grand jury proceeding), Globe Newspaper Co., 457 U.S. at 602 (victim trial testimony), and Press-Enterprise Co., 464 U.S. at 510 (juror voir dire)).  Thus, the Waller test is rightly regarded as a rule of general applicability in the courtroom closure context.  Cf. Musladin, 127 S. Ct. at 654 (Williams and Flynn speak only to state-sponsored conduct and do not provide a rule of general applicability that must be considered in spectator conduct cases).

13

Waller does not demand a higher showing before excluding a defendant's friends and family.  Nor does Waller's quotation of Oliver and its jeremiad against European judicial secrecy magically transmogrify the entire history of the common law right to a public trial into constitutional precedent.  See generally Oliver, 333 U.S. at 266-71 (discoursing at length on Jeremy Bentham and the various injustices of the Spanish Inquisition, English Court of Star Chamber, and the "French monarchy's abuse of the lettre de cachet").  AEDPA is concerned only with Waller's holding: that a courtroom closure must pass its four-part test.

4.    This Court's precedent

AEDPA itself tells us that the decisions of the courts of appeals cannot provide clearly established federal law.  28 U.S.C. § 2254(d)(1) (states must apply "clearly established Federal law, as determined by the Supreme Court of the United States").  Williams v. Taylor reinforced this principle.  See 529 U.S. at 412 (the phrase "refers to the holdings, as opposed to the dicta, of this Court's decisions" (emphasis added)).  Nevertheless, in the past we (and other courts) occasionally have relied on our own precedents to interpret and flesh out Supreme Court decisions to decide variegated petitions as they come before us.

It would appear that we can no longer do this.  Musladin made short work of the Ninth Circuit's use of Norris to extend

14

Supreme Court precedent on "inherent prejudice" caused by state-sponsored conduct into the context of private conduct. Musladin, 127 S. Ct. at 654 ("No holding of this Court required the California Court of Appeal to apply the test of Williams and Flynn to the spectators' conduct here." (emphasis added)). Although the Supreme Court noted the existence of a split on the spectator conduct issue among the circuits, see id. (collecting cases), there is no reason to believe that the Court would look more charitably on the use of circuit precedent to address an issue which had not yet divided (but might later divide) the courts.

Thus, despite Rodriguez's protestations, we can rely neither on Guzman v. Scully, 80 F.3d 772, 776 (2d Cir. 1996) ("The exclusion of courtroom observers, especially a defendant's family members and friends, even from part of a criminal trial, is not a step to be taken lightly."), nor Vidal v. Williams, 31 F.3d 67, 69 (2d Cir. 1994) (noting a tradition of "a special concern for assuring the attendance of family members of the accused"), nor Carson v. Fischer, 421 F.3d 83, 91 (2d Cir. 2005) (the "Court takes very seriously" the right to have family and friends present at trial), nor—critically—Yung, 341 F.3d at 111 (stating that "it would be an unreasonable interpretation of Waller for a court to [exclude a defendant's relative] if the exclusion of

15

that particular relative, under the specific circumstances at issue, is not necessary to promote the overriding interest").

In sum, as Rodriguez does not come within the narrow holdings of Oliver, Globe Newspaper, or Press-Enterprise, and cannot appeal to Supreme Court dicta or decisions of this Court, his petition stands or falls solely upon the application of the Waller test.

B.    Application

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams v. Taylor, 529 U.S. at 413. Under this standard, "a federal court may not issue the writ simply because that court concludes on its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Importantly, "[t]he more general the rule, the more leeway [state] courts have in reaching outcomes in case by case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

Here, the state courts did not unreasonably apply clearly established federal law. As we indicated in our prior opinion, we found little fault with their application of the general

16

Waller test in the abstract. See Rodriguez, 439 F.3d at 74. It is clear that the State has an "overriding interest" in protecting the identity of its undercover officers. See, e.g., Brown v. Artuz, 283 F.3d 492, 501-02 (2d Cir. 2002). The Undercover here had been threatened before and intended to return to Bushwick in the near future. The closure was to last only for the duration of the Undercover's testimony. The court made sufficient findings to support the closure based on the Undercover's testimony at the Hinton hearing. And we now wade hesitantly into the "semantic bog" we avoided last time to note that, even if the use of a screen to shield Rodriguez's family was a "reasonable alternative to closure," it was certainly considered (and in fact proposed) by the state court. See generally Waller, 467 U.S. at 48.

Indeed, Rodriguez conceded at the Hinton hearing that some form of closure was necessary but argued that the court could not exclude his family based on the limited testimony in the record. This was the basis for our prior decision to grant the writ—relying principally on Yung—and it is precisely the basis now foreclosed by Musladin. Thus, Rodriguez's petition must be denied.

**CONCLUSION**

The judgment of the district court is AFFIRMED.

17